## Case No. 2,370.

### CAMPBELL v. TRADERS' NAT. BANK.

[2 Biss. 423;[1] 3 N. B. R. 498 (Quarto, 124); 2 Chi. Leg. News, 148; 1 Md. Law Rep. 169.]

District Court, N. D. Illinois. Jan., 1871.[2]

BANKRUPTCY— GIVING WARRANT OF ATTORNEY IS PREFERENCE — INTENTION PRESUMED — WHEN PREFERENCE SET ASIDE — "SUFFERING" DEFINED.

1. A firm which for months has been unable to meet its liabilities as they mature, and was being pressed for payment, whose book-keeper had absconded, notifying its members of an error in their books to an amount equal to their general balance according to a recent statement, is insolvent within the meaning of the bankrupt act [14 Stat. 536], and its members have no right to believe themselves solvent.

[See note at end of case.]

2. Although some unusual event might enable them to pay their debts, they could not expect to do so in the ordinary course of business; and if in such circumstances they execute a warrant of attorney to one of their creditors, they are giving a preference.

[See note at end of case.]

3. Though they and the creditors say that it was not given for that purpose, yet such is its legal and necessary effect, and a man is presumed to intend the necessary consequences of his own acts.

[Cited in Re Dunkle, Case No. 4,160; Hall v. Wager, Id. 5,951; Re Heller, Id. 6,337; Re Jacobs, Id. 7,159.]

[See note at end of case.]

4. Though the creditor be guilty of no fraud in fact; yet if, suspecting the solvency of his debtor, he obtains property or money, and thereby a preference, and his debtor proves to be insolvent, he may be said to have had reasonable ground to believe that his debtor was insolvent, and cannot avail himself of a judgment or security so obtained; the fact that the warrant of attorney was executed under threats of legal process and arrest, and in fear of disgrace, does not shield the debtors; the act is, nevertheless, voluntary.

[Cited in Silverman's Case, Case No. 12,855; Goodenow v. Milliken, Id. 5,535; Martin v. Toof, Id. 9,167.]

[See note at end of case.]

5. There is a proper distinction between the words "suffer" and "procure," as used in the act; and it is these very things which a debtor under pressure and powerful motives brought to bear upon him "suffers," which the act intends to prevent.

[Cited in Re Dunkle, Case No. 4,160; Re Heller, Id. 6,337.]

[See note at end of case.]

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed in Traders' Nat. Bank v. Campbell, 14 Wall. (81 U. S.) 87.]

6. It seems, that where a man acts without knowledge of the condition of his debtor, or of anything to create suspicion of his solvency, and in good faith obtains a payment or security, the bankrupt law will not interfere with it.

In bankruptcy. This was a bill by George W. Campbell, assignee, of Hitchcock & Endicott, bankrupts [against the Traders' National Bank], to recover the proceeds of goods sold on execution upon judgments entered by confession a short time before the commencement of bankruptcy proceedings. It was claimed that the judgments were entered in fraud of the bankrupt act, the debtors being insolvent at the time the warrants of attorney were given, and their condition being known to the creditors. The bankrupts, being wholesale merchants in Chicago, commenced doing their banking business with the Traders' National Bank, in the fall of 1866. Early in the spring of 1867, being financially embarrassed, they gave to the defendants, Hotchkiss & Sons, a note with warrant of attorney, for a debt of over $1,300. In May, 1867, the president of the Traders' Bank inquired into the standing and pecuniary position and resources of Hitchcock & Endicott, partly, it would seem, to satisfy himself as the president of the bank, and partly with a view of properly answering inquiries that were made as to their condition. About the 10th or 12th of May, in reply to a request made by the president of the bank to Hitchcock & Endicott, a statement was furnished purporting to set forth the condition of the house—their assets, resources and liabilities—which showed a balance in their favor of over twelve thousand dollars. This statements seems to have been, to some extent at least, satisfactory to him, and the business went on in the usual way. During this time the bank had made very considerable loans to Hitchcock & Endicott, amounting by the 28th of May, to several thousand dollars. On the 24th of May, however, the president of the bank had received some information which induced him to believe that the statement which had been previously furnished was untrue. It appeared that the book-keeper of the firm had run away, leaving a letter to Mr. Hitchcock, saying that in the statement already referred to, a mistake of ten thousand dollars had been made, their liabilities being ten thousand dollars more than had been represented. Upon learning this fact, the president of the bank became somewhat alarmed, as to the condition of the account between the bank and Hitchcock & Endicott, as well as indignant that a false statement had been presented to him with a view of deceiving him, and took immediate measures to secure the indebtedness to the bank. During all this time, the house of Hitchcock & Endicott was in embarrassed circumstances, and did not meet its paper as it fell due. Renewals were made from time to time, and when notes and bills would become due to the Traders' Bank, in-

stead of being paid, a new transaction, as the president called it, was made, by which the loan was extended; in other words, the old note or bill was taken up and a new one given. Mr. Endicott was absent from the city at that time, and until immediately before the matter was finally closed. On the 28th of May a suit was commenced by the Traders' Bank against the firm, and an affidavit was made for a capias against Hitchcock on the ground that the statement made as to the condition of the firm was fraudulent. A summons issued against Endicott, and a capias against Hitchcock. As the result of this proceeding, on the 28th of May, in the evening, and under the threat of an arrest of Hitchcock by the sheriff, he and Endicott, the latter being induced to do so, as he said, in consequence of his belief that he was implicated with Hitchcock, consolidated all the indebtedness then due to the bank in a note, payable on demand, which they signed, and with which they gave a warrant of attorney to confess judgment thereon; and a judgment was accordingly entered on the next day, May 29th, 1867, against them, and execution issued and levied. On the 30th of May, Hotchkiss & Sons filed their warrant of attorney, and took judgment against Hitchcock & Endicott, and issued execution. The property of the firm was sold by the sheriff under these executions, and the proceeds placed in the Traders' Bank. This occurred a few days before the bankrupt law went into effect as to the filing of petitions, the proviso at the end of the law being, "that no petition or other proceeding under this act shall be filed, received or commenced before the first day of June, A. D., 1867." During the month of June, Hitchcock & Endicott filed a petition in bankruptcy, and some of their creditors also a petition against them. The former was abandoned, and the case proceeded under the involuntary petition. An injunction was issued from the district court to prevent the sale of the property, but a sale, as has already been stated, had been made by the sheriff. No application had ever been made to the court upon the subject, it being understood that the controversy was to be settled by a bill in chancery.

Melville W. Fuller, for assignee.
Samuel W. Fuller and Mattocks & Mason, for defendants.

DRUMMOND, Circuit Judge. There are several questions which arise, and which it becomes necessary to decide. The first is, whether in executing the warrants of attorney authorizing the judgments to be taken against them, Hitchcock & Endicott violated any provision of the bankrupt law. Secondly. Whether, if so, the Traders' Bank is affected by the action of Hitchcock & Endicott in such a way as to prevent it from availing itself of the money or property thus obtained.

As a part of these are several minor questions. Were Hitchcock & Endicott insolvent at the time they executed the note and gave the warrants of attorney to confess judgment? I have no doubt that they were, in fact, insolvent on the 28th of May, 1867. Their liabilities were between $30,000 and $40,000, and the difference between the assets and liabilities was such at the time that no intelligent business man could fail, I think, to reach the conclusion that they had not enough to pay their debts. There is no doubt now of the fact that they were insolvent. It has not been seriously controverted in the argument. It has been claimed that Hitchcock & Endicott did not believe they were insolvent, but thought that they would be able to continue their business and pay their debts.

Without dwelling longer upon the proof in favor of the conclusion that they were actually insolvent, we will proceed now to another question, namely—whether they, as reasonable and intelligent men, had a right to believe that they were insolvent.

They say that they thought they would be able to pay their debts. But why did they so think? They had been struggling for months to pay their debts, and had not done it. Bill after bill, and note after note, had matured, and had not been paid. They had given, early in March, a warrant of attorney authorizing a confession of judgment. They had been already sued; were on the 28th of May specially pressed by the Traders' Bank for payment or security of an indebtedness of more than six thousand dollars, which they could not meet. Their book-keeper had absconded, leaving word that he had made a mistake of $10,000 in the statement of their condition. As reasonable and intelligent men, what right had they to believe that they were in a solvent condition? Especially, if they complied with the peremptory and threatening demand of the president of the Traders' Bank, and gave a warrant authorizing a confession of judgment with the power to proceed against them at once, upon what ground could they suppose that they would be able to pay their debts? I cannot see, looking at the case as it is presented under the evidence, that there was any reason existing from which they could infer that they could pay their debts, in the ordinary course of business. Undoubtedly it was possible that some unforeseen event might occur to enable them to do it, but in the regular course of business, judging by what had taken place for several months past, extrication would seem well nigh impossible. Therefore, looking at their position with that degree of intelligence which every business man is supposed to bring to bear upon the state of his affairs in such an emergency, the best that could be said was that they were financially in an extremely critical condition. Certainly the president of the Traders' Bank so thought, if we are to judge by his actions. [They

were, then, insolvent. The proof before them of their condition was sufficient to justify any intelligent person in the conclusion that they were so insolvent.] [3]

In this state of affairs they were called upon, under the threat of an arrest from the principal creditor, to sign a note and give a warrant of attorney to confess judgment. If they were insolvent, as a matter of fact, and they were called upon in this way to give a note and warrant, with what object was it done? They say it was not to give a preference to the Traders' Bank. The president of the Traders' Bank also says that it was not done for that purpose. But for what other purpose could it be done than to give a preference? It follows as a legal conclusion, I think, from the state of facts then existing, and which facts were known to Hitchcock & Endicott, and from which they must be presumed to draw reasonable and intelligent conclusions, that the giving of this note and warrant of attorney did, in point of fact, operate as a preference.

There is only one possible contingency from which that result could be avoided, namely, that they signed the note and warrant of attorney under the belief that it would not be used, as a security, against them, and it is not pretended that there was anything of that kind attempted, or any hope to that effect held out to them. Mr. Endicott, it is true, says that he signed the note under the declaration of the counsel of the bank, when interrogated as to what would be done with the note and warrant of attorney if signed, that upon that point he had no instructions from the bank. Certainly no intelligent person could infer from such a statement that the warrant of attorney might not be used immediately, and that instructions might not come as soon as the warrant of attorney was signed, as in fact they did.

It is to no purpose that a man says, when he is insolvent and signs a note and warrant of attorney and gives it to his creditor, the effect of which is to enable that creditor to enter up judgment and issue execution and levy on his property, that he did not intend to give a preference. Actions, in this as in so many other cases, speak louder than words, and the conclusion necessarily follows from such a state of facts, that he does intend to do what is the necessary consequence of what he does, or, according to the oft repeated statement of the books, a man is supposed to know what is the necessary consequence of his own acts.

Then, the next question is—Had the president of the bank reasonable ground to believe that Hitchcock & Endicott were insolvent? I think he had. The language of the 35th and 39th sections of the bankrupt law is, substantially, that when there is a payment, sale, assignment, transfer or other conveyance made, or a warrant of attorney to confess judgment given, by a person who is insolvent, with the intention of creating a preference, and the party to whom it is so given has reasonable ground so to believe, the act by which that preference is sought to be accomplished shall become nugatory, and whatever money or property has been acquired thereby can be recovered back by the assignee in bankruptcy. I do not suppose that the president of the bank was guilty of, or intended to commit any fraud in fact. His bank had loaned Hitchcock & Endicott a very considerable sum of money; he had become alarmed as to their condition, and desired to put an end to all business transactions between the bank and them, and naturally wished to obtain his debt or security for it as soon as practicable. His whole conduct evinced alarm, and a suspicion that Hitchcock & Endicott would not be able to pay their debts. And I take it to be a sound rule, that when a person suspects the solvency of his debtor, and in consequence of that suspicion obtains property or money, and thereby a preference, and it turns out in fact that his debtor is insolvent, that he may be said to be in the predicament contemplated by the bankrupt law; he has reasonable ground to believe that his debtor is insolvent, and so cannot avail himself of the payment made or the security obtained. The 39th section of the bankrupt law declares that if any insolvent person shall give any warrant to confess judgment, or procure or suffer his property to be taken on legal process with intent to give a preference, he shall be deemed to have committed an act of bankruptcy.

There remains, then, the question whether Hitchcock & Endicott, within the meaning of the law, suffered their property to be taken on a legal process. It has been insisted that they were not within these terms of the bankrupt law. I admit that it must be an act of volition on their part; it must be, in other words, something that is done voluntarily. The mind must act freely, not under duress; and the question is, whether Hitchcock & Endicott did, in this case, within the meaning of this law, suffer their property to be taken on legal process. I think they did. It is true that there was a moral force brought to bear upon them to induce them to sign the note and give the warrant of attorney, but they did it, as they say, because they did not wish to bear the indignity and the injurious effects which might flow from the arrest of one member of the firm. But it was none the less a voluntary act on their part. They, as free agents, signed the note and warrant of attorney. The motives that were brought to bear upon them may have been of more or less stringency, but it was not done under duress. Indeed, the threat of arrest was made upon an ordinary capias in a civil suit, and it does not even appear that the arrest could have been sustained. Then, being voluntary, did they intend to

---

[3] [From 3 N. B. R. (Quarto) 124.]

suffer their property to be taken on legal process? If they did not intend this, what did they intend? For what did they give the note and sign the warrant of attorney? What possible object could the president of the Traders' Bank have had in demanding the execution of these instruments, except to take their property on legal process? As rational and intelligent men, what other inference could they draw from what had taken place? And looking at the matter under the operation of these causes, what other conclusion can follow than that they intended to suffer their property to be taken on legal process?

I entirely agree with those courts which declare that the word "suffer" is different from the word "procure;" "suffer" implies a passive condition, so to speak—as to allow to permit—not a demonstrative, active course, like the word procure. It is the very definition, I think, to apply to the case of pressure and powerful motives brought to bear upon a party. Under the influence of this pressure and the operation of these motives, he suffers a thing to be done—that is, allows or permits it—and the law intended to prevent this.

Again, it is impossible to lose sight of the time during which these matters were transacted—the 28th and the 29th of May, 1867. The bankrupt law went into operation on the 1st of June, a few days afterwards, so far as to allow the filing of petitions. The president of the Traders' Bank acted under the influence, as he admits, of the bankrupt law, and of certain views and opinions which he had in relation to it. What was to be done had to be done quickly, or on the 1st of June these parties or any one of their creditors could file a petition in bankruptcy, and then there was no chance of any preference. So that the inference, I think, derivable from the peculiar juncture at which the transactions took place, is unfavorable to the Traders' Bank, as well as to Hitchcock & Endicott. The great principle of the bankrupt law—the equal distribution among all the creditors of the property of a man unable to pay his debts—is, I think, attacked in this case by the attempt by which the Traders' Bank sought to obtain a preference. It was natural, perhaps, that the president of the Traders' Bank should seek the payment of the debt; most men, possibly, would have done the same; but it is not the less true, in my judgment, that such a course of action does interfere with the operation of the bankrupt law, and prevent the equal distribution of the assets of this firm to their creditors.

It has been said, and will be said again. that we ought not to prevent or interfere with the ordinary business operations between man and man. That is true, and we do not attempt to do it unless there is something in the transaction indicating that the man who makes it has reason to believe that he is getting what ought to belong to the creditors generally, and if so, the bankrupt law declares that he cannot avail himself of money or property thus obtained. But where a man acts without knowledge of the condition of the party or of anything to create suspicion of his solvency, and in good faith obtains a payment or security, then the bankrupt law will not interfere with it.

[I have considered exclusively the relations of Hitchcock & Endicott with the Traders' Bank. The bill will be dismissed as to Hotchkiss & Sons. They are not in court. The facts applicable to that case are somewhat different from those existing in the case of the Traders' Bank. Their warrant of attorney was given on the 5th of March. The condition of Hitchcock & Endicott had not been so completely developed at that time as it was on the 28th and 29th of May. The sheriff is not a party and is not in court. It is possible that Hotchkiss & Sons might be compelled to abide the consequences of the action of the court if the sheriff was in court, on the ground that he represented them, but it is not necessary to decide this point.] [4]

The Traders' Bank has obtained the benefit of an unwarrantable preference; the property has been sold and the money paid over to them—possibly sold at a sacrifice; the proof as to what it was actually worth is not, perhaps, very satisfactory; and although, in many cases, what property may bring at a forced sale is not the true criterion of its value, I feel inclined to take that view of the case in this instance, and to hold that the Traders' Bank is responsible for nothing more than the proceeds of the sale. The property was sold under two executions, that of the Traders' Bank and Hotchkiss & Sons, and the proceeds were more than the execution of the Traders' Bank. There was besides a payment of over $300 made on the debt, of money in the hands of the Traders' Bank, on the 29th of May, and for which a check was given, and there was $900 of money which was levied upon in the hands of the Traders' Bank, by the sheriff, at its instance. I think that these incidents will have to follow the principle; that the result of the reasoning which has been stated leads necessarily to the conclusion that the same consequences flow from the payment and levy of these sums, and therefore that they would be included as a part of the amount of damages for which the Traders' Bank would be responsible, and I think the Traders' Bank will be liable, also, for the interest from the time of the receipt of the money. As some incidental questions may arise, perhaps it is better that the case should be referred to a master. Referred accordingly.

On appeal to the circuit court, Judge Davis, of the supreme court, sitting as circuit

[4] [From 3 N. B. R. (Quarto) 124.]

judge, affirmed the decision below, filing the following opinion:

DAVIS, Circuit Justice. This case was argued with ability and earnestness, and I have carefully considered the questions presented in connection with the evidence. My conclusion, on the whole evidence, is that Hitchcock & Endicott, when they gave the note and warrant of attorney to the Traders' National Bank to confess judgment, were, in fact, insolvent, and, as reasonable men, had good cause to believe themselves insolvent, and that the president of the bank had reasonable ground also to believe them insolvent. The evidence also satisfies me that the note and warrant of attorney were executed with a view to give a preference to the bank. The evidence also establishes the fact that Hitchcock & Endicott "suffered" their property to be taken on legal process. If the evidence establishes these propositions, and I think it does, clearly, then the decree of the district court was correct, and should be affirmed. Decree affirmed.

NOTE [from original report]. The supreme court, on appeal, again affirmed the decision of the court below, the opinion being reported in 14 Wall. [81 U. S.] 87. Consult Golson v. Niehoff [Case No. 5,524]; In re Weeks [Id. 17,350]; In re Eldridge [Id. 4,330], and authorities there cited. As to what constitutes insolvency, consult Merchants' Nat. Bank v. Truax [Id. 9,451]; In re Gay [Id. 5,279]; In re Wright [Id. 18,071]; Wadsworth v. Tyler [Id. 17,032]; Scammon v. Cole [Id. 12,-433]; Graham v. Stark [Id. 5,676]; Driggs v. Moore, Foote & Co. [Id. 4,083]; Rison v. Knapp [Id. 11,861]; Hall v. Wager [Id. 5,951]; Wilson v. City Bank [17 Wall. (84 U. S.) 473]; Toof v. Martin, 13 Wall. [80 U. S.] 40. In order to invalidate a transaction, it is not necessary that the debtor at the time should consider himelf insolvent. Haughey v. Albin [Case No. 6,222]; Graham v. Stark [Id. 5,676]; Scammon v. Cole [supra]; Rison v. Knapp [supra]; Hall v. Wager [supra]. What constitutes "suffering his property to be taken," etc.: In re Black [Case No. 1,457]; Wilson v. Brinkman [Id. 17,-794]; Fitch v. McGie [Id. 4,835]; In re Dibblee [Id. 3,884]; In re Wright [supra]; In re Wells | Case No. 17,388]; Hardy v. Clark [Id. 6,-058]; Street v. Dawson [Id. 13,533]; Wilson v. City Bank [supra]; Kohlsaat v. Hoguet [Case No. 7,919].

[NOTE. The grounds of the affirmation by the supreme court, as set forth in the headnotes to the report of that case, and which were prepared by Mr. Justice Miller, are that the judgment, though taken before the 1st day of June, 1867, but after the enactment of the bankrupt law, was an unlawful preference under the thirty-fifth section of that act; that, the proceeds of the sale of the bankrupt's goods being in the hands of the defendant, another person, who had a like judgment and execution levied on the same goods, was not a necessary party to this suit, being without the jurisdiction; that the proceeds of the sale being in the hands of the bank, though it has given the sheriff a certificate of deposit, the assignee was not obliged to move against the sheriff in the state court to pay over the money to him, but had his option to sue the bank which had directed the levy and sale, and held the proceeds in its vaults; that the defendant, having money received as collections for the bankrupt, delivered it to the sheriff, who levied the defendant's

execution upon it, and applied it in satisfaction of the same,—this was a fraudulent preference or taking by process under the act, and did not raise the question whether, if defendant had retained the money, it could be set off in his suit against the bankrupt's debt to defendant; and that taking the check from the bankrupt, and crediting the amount of the check then on deposit on the bankrupt's note the day before taking judgment, was a payment by way of preference, and therefore, void, and did not raise the question of set-off.]